UNITED STATES DISTRICT COURT

**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
NESTOR CARDENAS,

                              Plaintiff,                **COMPLAINT**

                    -against-

NEW YORK-PRESBYTERIAN MEDICAL      **PLAINTIFF DEMANDS**
GROUP/QUEENS                                      **A TRIAL BY JURY**

                              Defendant.
-------------------------------------------------------------X

      Plaintiff NESTOR CARDENAS, ("Plaintiff"),[1] by and through his attorneys PHILLIPS & ASSOCIATES, ATTORNEYS AT LAW, PLLC, hereby complains of the Defendant, NEW YORK-PRESBYTARIAN MEDICAL GROUP/QUEENS, upon information and belief, alleges and avers as follows:

## NATURE OF THE CASE

1. Plaintiff brings this action alleging that the Defendant has violated the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 *et seq.*, as amended, ("ADA"), the New York State Human Rights Law, New York State Executive Law §§ 290 *et seq.* ("NYSHRL"), the New York City Human Rights Law, New York City Administrative Code §§ 8-107 *et seq.* ("NYCHRL"), and seeks damages to redress the injuries he has suffered as a result of being discriminated against by his employer on the basis of his disability, subjecting him to a disability-based hostile work environment, failing to provide a reasonable accommodation, and wrongfully terminating his employment because of his disability, and

---

[1] Plaintiff's legal name is Nestor Cardenas; however, he went by his preferred name Jonathan throughout his employment with Defendant.

1

in retaliation for engaging in protected activity.

## **JURISDICTION AND VENUE**

2. Jurisdiction of this Court is proper under 42 U.S.C. §§ 12101 *et seq*., and 28 U.S.C. §§ 1331 and 1343.

3. The Court has supplemental jurisdiction over Plaintiff's claims brought under state law pursuant to 28 U.S.C. § 1367.

4. Venue is proper in this district, pursuant to 28 U.S.C. § 1391(b), as it is a judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

## **PROCEDURAL PREREQUISITES**

5. Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), on April 18, 2022, within 300 days of his discriminatory termination.

6. By: (a) timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on April 18, 2022 (b) receiving a Notice of Right to Sue from the EEOC on August 24, 2022; (c) commencing this action within 90 days of the issuance of the Notice of Right to Sue by the EEOC; and (d) contemporaneously with the filing of this Complaint, mailing a copies thereof to the New York City Commission of Human Rights ("NYCCHR") and the Office of the Corporation Counsel of the City of New York pursuant to the notice requirements of § 8-502 of the New York City Administrative Code, Plaintiff has satisfied all of the procedural prerequisites for the commencement of the instant action. A copy of the Notice of Right to Sue is annexed hereto as Exhibit A; a copy of the transmittal letter to the NYCCHR, *et ano.*, is annexed hereto as Exhibit B.

## PARTIES

7. Plaintiff is a 33-year-old male who lives in the State of New York, County of Queens.

8. Plaintiff is a person with bipolar affective disorder.

9. Bipolar affective disorder is a mental health impairment that imposes a substantial impact on brain function, a major life activity.

10. Under 29 CFR § 1630.2(j)(3), the EEOC recognizes that bipolar disorder "should easily be concluded…that at a minimum, substantially limit[s] the major life activities" and be regarded as a disability.

11. Plaintiff's bipolar disorder is a lifelong, chronic condition for which he is being treated by a combination of medication, psychotherapy, and maintaining a consistent and regulated schedule.

12. In order to avoid triggering his bipolar disorder, Plaintiff requires the maintenance of a stable work and sleep schedule. When Plaintiff did not have such a consistent schedule, he has experienced manic episodes that has led to his hospitalization on at least two occasions.

13. During manic episodes, Plaintiff has trouble eating, sleeping, showering, working, concentrating, and performing work tasks.

14. The EEOC notes that "chronic, episodic conditions may constitute substantially limiting impairments if they are substantially limiting when active or have a likelihood of recurrence in substantially limiting forms…psychiatric impairments such as bipolar disorder…may remit and intensify, sometimes repeatedly, over the course of several months or several years." eeoc.gov/laws/guidance/enforcement-guidance-ada-and-psychiatric-disabilities

15. While Plaintiff's bipolar disorder is being treated, Plaintiff experienced chronic manic episodes during his employment with Defendant and will likely continue to experience manic episodes that substantially limit his ability to perform major life activities.

16. Defendant New York Presbyterian Medical Group of Queens ("New York Presbyterian") is a non-profit licensed to do business in New York and its principal place of business is 56-45 Main Street, Queens, NY 11355.

17. New York Presbyterian oversees a network of medical facilities, including Bayside Primary Care located at 44-02 Francis Lewis Boulevard, Bayside, NY 11361 ("Bayside Facility").

18. Defendant New York Presbyterian has more than 500 employees.

19. At all times, Defendant New York Presbyterian was an "employer" subject to the ADA.

20. Plaintiff was an employee of Defendant New York Presbyterian at all relevant times and was capable of performing the essential functions of his job, with or without a reasonable accommodation.

## MATERIAL FACTS

21. On or about June 27, 2016, Plaintiff began working for Defendant NY Presbyterian as a Patient Liaison.

22. At the time of his unlawful termination, he earned approximately $42,000/year or $20.50/hour.

23. Plaintiff worked at the Bayside Facility.

**Defendant Is Aware of Plaintiff's Disability**

24. In or around July 2019, Plaintiff first reported his disability, specifically bipolar disorder, to his supervisor, Zdenka Hackett ("Hackett"), Practice Manager, at the Bayside Facility.

25. Plaintiff told Hackett that he had been admitted to the hospital from June 24, 2019, to July 10, 2019, due to flareups caused by his bipolar disorder.

26. Because of his disability, Plaintiff exercised his Family and Medical Leave Act ("FMLA") rights, taking a leave from July 2019 to October 2019, in order to recuperate from the episode.

27. On October 29, 2019, Plaintiff's psychiatrist recommended that Plaintiff return to work with a modified schedule to help alleviate his work-induced stress.

28. The doctor set forth an accommodation request related to his return, writing, "You are psychiatrically stable to return to work at a part time capacity, 4 hours a day for 2 weeks beginning Nov. 4, 2019. You can resume fulltime duty as tolerated on Nov 18, 2019."

29. In speaking by phone with Hackett just prior to his return, Plaintiff shared that he had been feeling overwhelmed at work prior to and leading up to the episode, and therefore, the phased-in approach was needed.

30. Hackett coldly responded: "This is your job, Jonathan."

31. Hackett begrudgingly approved Plaintiff's accommodation request for a modified schedule.

**Plaintiff Is Denied a Reasonable Accommodation**

32. When two weeks passed, Plaintiff felt that he required more time to ease into his stressful work environment.

33. Plaintiff's psychiatrist contemplated an extension of the modified schedule in his note, indicating that Plaintiff may not be able to return full-time in two weeks.

34. Plaintiff approached Hackett and requested that his accommodation be extended for an additional two weeks to aid his recovery and transition at work.

35. Hackett, in sum and substance said, "No, you need to start full-time on Monday."

36. Hackett outright refused Plaintiff's accommodation request without engaging in an interactive process or requesting additional medical information.

37. Hackett did not request further medical documentation supporting Plaintiff's request.

38. On or about November 18, 2019, Plaintiff returned full-time fearing he would be terminated if he did not.

**Disability-Related Harassment and Retaliation for Requesting an Accommodation**

39. Upon return to the Bayside Facility, Plaintiff noticed that his coworkers were treating him differently and staring at him inappropriately.

40. On Plaintiff's first day back, one coworker expressed utter surprise when she saw him and dropped her coffee on the ground.

41. Other coworkers refused to speak with Plaintiff and kept their distance.

42. Upon information or belief, Plaintiff believes that Hackett violated his medical privacy by alluding to Plaintiff's bipolar disorder and hospitalization with his colleagues during an officewide meeting prior to Plaintiff's return.

43. Additionally, upon his return, Plaintiff was assigned to a basement office, even though he had previously worked in a more favorable, above-ground office prior to going on leave.

44. Hackett also began harassing Plaintiff by scrutinizing his work unnecessarily and treating him with hostility.

45. For instance, Hackett would repeatedly go to his coworkers behind his back and ask how Plaintiff was doing and whether he completed his work.

46. Hackett had not engaged in this conduct prior to Plaintiff's leave.

47. Plaintiff's coworkers told him they felt uncomfortable with Hackett's behavior, and they

felt apologetic.

48. Additionally, when Plaintiff asked Hackett basic scheduling or insurance questions, Hackett would feign confusion and say, in sum and substance, "Jonathan, I don't know what you are talking about," leaving Plaintiff feeling inadequate, embarrassed, and frustrated.

49. Hackett had not treated Plaintiff with such hostility prior to his FMLA leave.

50. Hackett's harassment led Plaintiff to avoid asking Hackett for assistance whenever possible, as he feared her ridicule and harassment.

51. He asked other coworkers for assistance with workplace matters instead.

52. Despite this violation of his medical privacy and harassment from Hackett, Plaintiff carried out his job competently and without issue until June 2021.

53. On or about May 2021, NY Presbyterian installed a new electronic medical records system called Epic that staffers were required to utilize.

54. The transition to the new medical records system caused some disruption to the Bayside Facility, and the office needed additional staffing as some of its employees had difficulty utilizing the system.

55. On or around June 2021, Plaintiff began working overtime, showing up to the office earlier and leaving later, to assist his coworkers with the new medical records system. Plaintiff worked three weeks straight, including weekends, to assist medical assistants, doctors, and even Hackett, with the new records system.

56. Hackett was thankful for Plaintiff's work during this difficult period. Hackett told Plaintiff in sum and substance, that he had become a leader and she was so proud of him that she could cry.

57. Still, Plaintiff began to feel incredibly anxious, as the stress of working over seventy hours in a single week was taking a toll on his mental health.

58. During this period, Plaintiff told his psychiatrist that his anxiety was flaring up due to work-related stress and that he had started to experience periods of sleeplessness.

59. On or about June 17, 2021, Plaintiff was the only employee working at the front desk.

60. Upon information or belief, the front desk was typically staffed by four employees, however due to staffing shortages, Plaintiff was the sole employee working in this particular area.

61. Due to the shortage, Plaintiff had to deal with an increased workload between fielding questions from patients, responding to emails and answering incoming phone calls.

62. While Plaintiff was in the midst of a phone call, Hackett stormed into the front desk area and yelled at Plaintiff: "I have been getting complaints that you have not been answering phone calls."

63. Plaintiff explained that he was answering the calls, however he was the only employee working the front desk.

64. Hackett ignored Plaintiff's response and stormed off.

65. Plaintiff felt upset by Hackett's false accusation, as he had been answering the phones and had been dealing with several phone calls and patient inquiries at that time.

66. Following this incident, Plaintiff's bipolar disorder began to flare up and he began to experience increased anxiety and sleeplessness.

67. On or about June 25, 2021, the office was again short-staffed as Plaintiff's coworker Yamila Pichardo ("Yamila") was not in the office.

68. Plaintiff and his coworker Nicole (LNU) ("Nicole") were the only employees assigned to

the front desk area.

69. Due to the shortage, Plaintiff had to deal with an increased workload between fielding questions from patients, responding to emails, and answering incoming phone calls.

70. That day, Hackett became upset with the Plaintiff and angrily accused him of not answering the phone when she had called.

71. Plaintiff explained that he had not answered the phone as he was taking a message for a patient.

72. As this tense conversation went on, another call came in from a coworker who needed assistance with a different matter.

73. To diffuse the situation and avoid being personally triggered, Plaintiff asked Hackett if he could assist the coworker. Hackett yelled at Plaintiff, in sum and substance, "You are not going anywhere, and you will not leave this desk."

74. Hackett then stormed out of the room and slammed the door of her office behind her.

75. Plaintiff also observed Hackett call in two of his coworkers, Adriana Castro and Mary Lou Demaria for a discussion.

76. Upon leaving Hackett's office, Plaintiff's coworkers purposely avoided looking at him.

77. Plaintiff was extremely humiliated and stressed by the whole encounter as Hackett had been yelling at him in front of his coworker Nicole, and likely had a closed-door discussion about him with his other coworkers.

78. Plaintiff continued to work until the end of his shift.

**Defendant's Knowledge That Plaintiff Required an Accommodation for His Disability-Related Episode**

79. The next day, on or about June 26, 2021, Plaintiff's anxiety and sleeplessness escalated.

80. Plaintiff was particularly concerned because insufficient sleep can be a trigger for a bipolar disorder episode.

81. That day, Plaintiff contacted Elizabeth Spitzer ("Spitzer"), Practice Administrator, and Angela Pipea ("Pipea"), Practice Manager, to inform them that he was ill and would be taking leave.

82. Plaintiff went to his psychiatrist who prescribed him medication to help him cope with this stressful and anxiety-inducing incident and the ongoing hostile work environment caused by Hackett.

83. Knowing he needed a break to get his symptoms stabilized, Plaintiff contacted Unum for Short Term Disability and FLMA leave which Unum approved through July 13, 2021, stating, "*On July 5, 2021, Unum was notified of your need for leave beginning on June 26, 2021 due to your own serious health condition.*"

84. On July 4, 2021, Plaintiff reached a crisis point with his disability and went to the emergency room to seek treatment.

85. He was discharged on July 5, 2021, and was prescribed new medication.

86. On or about July 6, 2021, Plaintiff had a telehealth appointment with his primary care physician Dr. Pavlovici ("Dr. Pavlovici") at the Facility who informed Plaintiff that he was in the midst of hypomanic episode, an episode of extreme mood change.

87. That day, Plaintiff texted Hackett "I will not be coming in tomorrow… [due to a] private matter."

88. Given that Dr. Pavlovici worked alongside Hackett, and he had observed her speaking openly about patients' medical conditions, Plaintiff believes that Dr. Pavlovici informed

10

Hackett about Plaintiff's current medical status in violation of HIPAA.

**<u>Defendant Coercively Terminated Plaintiff, After Rejecting His Accommodation Request</u>**

89. On July 7, 2021, while still on disability-related leave, Plaintiff called Hackett to complain about her harassment of him. Plaintiff told Hackett, in sum and substance, that she was creating a hostile work environment for him due to his disability, and as a result, he was experiencing a "nervous breakdown" due to the stress.

90. Plaintiff requested Hackett transfer him to a less stressful position as an accommodation.

91. Hackett was dismissive of Plaintiff's complaints and summarily denied his accommodation request without engaging in an interactive process.

92. Then, Hackett callously told Plaintiff to submit a letter of resignation and stated, in sum or substance, "You need to resign."

93. Plaintiff did not wish to resign his employment. He did not call to resign his employment, but to receive help and to complain of Hackett's unfair treatment.

94. Plaintiff was experiencing hypomania and was medicated during the call.

95. Plaintiff's speech and behavior indicated that he was not in an abnormal, highly emotional state.

96. According to the American Psychiatric Association, during a hypomania episode, an individual's behavior "represent[s] a noticeable change from usual behavior, and [symptoms] have been present to a noticeable degree." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders, 5th Edition* (May 2013).

97. Hackett knew that Plaintiff had bipolar disorder and she had just received reports that he was acting erratically at work just prior to his request for time off.

98. Additionally, Hackett would have been made aware of Plaintiff's current distressed

11

medical status, as he had informed Spitzer and Pipea of his flareups and his inability to work.

99. Spitzer and Pipea spoke with Hackett on a daily basis and would have informed Hackett of Plaintiff's employment status.

100. Unum would have sought approval from NY Presbyterian before granting his disability related leave request made on June 26, 2021.

101. Hackett knowingly took advantage of Plaintiff's disability to get rid of him.

**Defendant's Knowing Enforcement of the Discriminatory Termination**

102. On or about July 08, 2021, Plaintiff received a letter stating that he had resigned on July 07, 2021, which he disputed.

103. Plaintiff tried to follow up several times to correct the contention that he resigned to no avail. The illegal and unfair termination exacerbated Plaintiff's mental health episode.

104. As Plaintiff was hospitalized soon after, his mother also tried to follow up.

105. Plaintiff's mother made a call directly to Hackett to ask why she terminated her son. Hackett hung up on her.

106. She also called Elizabeth Spitzer, detailing the chain of events which are in stark contradiction to Defendant's narrative regarding the call. This call was captured on audio.

107. Despite the clear disability related medical status of Plaintiff, his and others' complaints on his behalf of a disability-related termination, are ignored.

108. Upon information and belief, NY Presbyterian never investigated his allegations of discrimination, contrary to its legal requirement to do so, and never sought to rectify the termination despite the knowledge that it was illegal and discriminatory.

**Harm to Plaintiff**

109. The discriminatory harassment and termination experienced by Plaintiff due to his disability has caused him to suffer humiliation, embarrassment, anxiety and other emotional distress and physical distress symptoms.

110. Prior to the illegal termination, Plaintiff was competently performing the essential functions of his job and could have continued performing the essential functions of the job, with or without a reasonable accommodation.

111. Defendant failed to ensure Plaintiff had the reasonable accommodations he requested and needed for his job and denied several reasonable accommodation requests.

112. Defendant failed to engage in an interactive process related to reasonable accommodation requests with Defendant.

113. Defendant's conduct demonstrates that the discriminatory conduct was carried out because it viewed Plaintiff and his disability through the lens of negative stereotypes related to his disability.

114. Defendant's conduct to dispose of Plaintiff because of his disability, rather than accommodate Plaintiff, was egregious, reprehensible, and demonstrative of animus.

115. Defendant wholly failed to investigate the allegations of discrimination or to rectify the discriminatory conduct it was fully aware of.

116. Defendant's actions and conduct were intentional and aimed at harming Plaintiff.

117. Defendant knowingly and willfully discriminated against Plaintiff because of his disability, failed to grant a reasonable accommodation as required by law, and illegally terminated his employment in retaliation for Plaintiff complaining of discrimination and retaliation.

118. As a result of the acts and conduct complained of herein, Plaintiff has suffered a loss of income, the loss of a salary, bonus, benefits, and other compensation, which such

employment entails.

119. Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

120. Plaintiff has experienced severe emotional distress.

121. As a result of the above, Plaintiff has been damaged in an amount which exceeds the jurisdictional limits of the Court.

122. Defendant is an employer subject to the ADA, the NYSHRL and the NYCHRL.

123. At all relevant times, Plaintiff was an individual with a disability as defined by the ADA, the NYSHRL and the NYCHRL.

124. At all relevant times, Plaintiff was a qualified individual who could perform the essential functions of his employment with or without a reasonable accommodation as defined by § 12111(8) of the ADA.

125. At all times relevant, Plaintiff's disability substantially limited one or more major life activities within the meaning of § 12102(1)(A) of the ADA.

126. Defendant's conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

127. As such, Plaintiff demands punitive damages against Defendant.

## AS A FIRST CAUSE OF ACTION
## DISCRIMINATION UNDER THE ADA

128. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

129. Plaintiff claims Defendant New York Presbyterian violated the Americans with Disabilities Act of 1990 (Pub. L. 101-336), as amended, as these titles appear in volume 42 of the United States Code, beginning at Section 12101.

130. Title 42 of the Americans with Disabilities Act of 1990, Chapter 126, Subchapter I, Section 12112 "Discrimination" states: "(a) General rule. - No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

131. Defendant New York Presbyterian engaged in unlawful employment practices in violation of the Americans with Disabilities Act by refusing to accommodate Plaintiff, treating Plaintiff with hostility, and terminating him because of his disability.

## AS A SECOND CAUSE OF ACTION
## RETALIATION UNDER THE ADA

132. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

**133.** 42 U.S.C. § 2000e-3(a) states that it shall be an unlawful employment practice for an employer:

> (1) to . . . discriminate against any of his employees . . . because [s]he has opposed any practice made an unlawful employment practice by this subchapter, …

134. The above section forbids retaliation for engaging in protected activities, including requesting a reasonable accommodation and complaining of discrimination.

**135.** Defendant engaged in unlawful discriminatory practices by terminating Plaintiff because by treating Plaintiff with hostility and terminating Plaintiff for complaining of the aforementioned violations.

## AS A THIRD CAUSE OF ACTION
## DISCRIMINATION UNDER THE NYSHRL

136. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of

this Complaint.

137. The New York State Executive Law § 296(1)(a) provides that,

> It shall be an unlawful discriminatory practice: For an employer … because of an individual's … disability… to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

138. Defendant New York Presbyterian engaged in unlawful employment practices in violation of New York State Executive Law § 296(1)(a) by refusing to accommodate Plaintiff, treating Plaintiff with hostility, and terminating him because of his disability.

## AS A FOURTH CAUSE OF ACTION
## RETALIATION UNDER THE NYSHRL

139. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

140. The New York State Executive Law § 296(1) (e) and (h) forbid retaliation for engaging in protected activities.

141. Defendant engaged unlawful discriminatory practices in violation of the New York State Executive Law § 296(1)(e) and (h) by treating Plaintiff with hostility and terminating Plaintiff for complaining of the aforementioned violations.

## AS A FIFTH CAUSE OF ACTION
## DISABILITY DISCRIMINATION UNDER THE NYCHRL

142. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

143. The New York City Administrative Code §8-107(1) provides that: "[i]t shall be an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of…disability…to refuse to hire or employ or to bar or to discharge from employment such

person or to discriminate against such person in compensation or in terms, conditions or privileges of employment."

144. Defendant engaged in unlawful discriminatory practices in violation of the NYCHRL by refusing to accommodate Plaintiff, treating Plaintiff with hostility, and terminating him because of his disability.

### AS A SIXTH CAUSE OF ACTION
### RETALIATION UNDER THE NYCHRL

145. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

146. The Administrative Code of City of NY § 8-107 (6) forbids retaliation for engaging in protected activities.

147. Defendant engaged in unlawful discriminatory practices in violation of the NYCHRL by treating Plaintiff with hostility and terminating Plaintiff for complaining of the aforementioned violations.

### JURY DEMAND

148. Plaintiff requests a jury trial on all issues to be tried.

### PRAYER FOR RELIEF

**WHISEFORE**, Plaintiff respectfully requests a judgment against Defendant:

A. Declaring that Defendant engaged in unlawful employment practices prohibited by the ADA, the NYSHRL, and the NYCHRL by discriminating against Plaintiff on the basis of his disability;

B. Awarding damages to the Plaintiff, retroactive to the date of his discharge for all lost wages and benefits resulting from Defendant's unlawful termination of his employment and to

otherwise make his whole for any losses suffered as a result of its unlawful employment practices;

C. Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to his reputation in an amount to be proven;

D. Awarding Plaintiff punitive damages;

E. Awarding Plaintiff attorneys' fees, costs, interests, and expenses incurred in the prosecution of the action;

F. Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy the Defendant's unlawful employment practices.

Dated:  New York, New York
        November 15, 2022

        **PHILLIPS & ASSOCIATES,**
        **ATTORNEYS AT LAW, PLLC**

        Michelle A. Caiola, Esq.
        Jonathan Goldhirsch, Esq.
        *Attorneys for Plaintiff*
        45 Broadway, Suite 430
        New York, New York 10006
        T: (212) 248-7431
        F: (212) 901-2107
        mcaiola@tpglaws.com