United States District Court
Eastern District of New York

-----------------------------------X

Nestor Cardenas,

        *Plaintiff*,        **MEMORANDUM & ORDER**

  - against -        No. 22-CV-07000 (KAM)(LKE)

New York Queens Medicine and Surgery
P.C. d/b/a New York Presbyterian
Medical Group/Queens,

        *Defendant*.

-----------------------------------X

**Kiyo A. Matsumoto, United States District Judge:**

      Plaintiff Nestor Cardenas commenced this action against his former employer, defendant New York-Presbyterian Medical Group/Queens[1] ("New York-Presbyterian," "Medical Group," or "Medical Center"), on November 16, 2022. (ECF No. 1.[2]) Plaintiff, who has bipolar disorder and major depressive disorder with psychotic features, alleges Defendant violated federal, state, and city laws by engaging in disability discrimination and retaliation.[3] Pending before the Court is Defendant's motion for

---

[1] Defendant notes that the correct name of the defendant in this action should be New York Queens Medicine and Surgery P.C. d/b/a New York Presbyterian Medical Group/Queens. (ECF No. 48-1 at 7 n.1.) The Clerk of Court is respectfully directed to update the defendant's name accordingly.

[2] Unless otherwise noted, pinpoint citations in this Memorandum and Order refer to the document numbers and page numbers assigned by the CM/ECF system.

[3] Plaintiff's federal claims arise under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq., as amended*. His state claims arise under the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.*

summary judgment on all claims.

For the reasons explained below, the Court GRANTS Defendant summary judgment on Plaintiff's two federal claims (Claims One and Two) and DECLINES supplemental jurisdiction over Plaintiff's four remaining state and city claims (Claims Three, Four, Five, and Six).

## BACKGROUND

### I.    Procedural Background

On August 24, 2022, the Equal Employment Opportunity Commission ("EEOC") issued a "Right to Sue" letter to Plaintiff. (ECF No. 1-1.)  Plaintiff timely filed his complaint in this case on November 16, 2022.  (ECF No. 1.)  Defendant filed its answer on January 23, 2023.  (ECF No. 10.)  After an extended discovery period and a pre-motion conference for Defendant's motion for summary judgment, the parties filed their summary judgment briefings on April 7, 2025.[4]  (ECF Nos. 48-50.)

### II.   Factual Background[5]

In June 2016, Plaintiff was hired by Defendant as a

---

His city claims arise under the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §8-107 *et seq.*

[4] Although not at issue in this motion, Magistrate Judge Eshkenazi granted Plaintiff's counsel's motion to withdraw on April 8, 2025, after Plaintiff's counsel filed Plaintiff's opposition to Defendant's motion for summary judgment. (*See* April 8, 2025 Dkt. Order.)

[5] Unless otherwise noted, the following facts are deemed undisputed based on the parties' submissions.  Internal quotations are omitted from quotations of the parties' statements of undisputed material facts submitted in accordance with Local Civil Rule 56.1.

Patient Access Liaison at Defendant's medical center in Bayside, a neighborhood in New York City. (ECF No. 40, ("Pl.'s 56.1 Counterstatement"), ¶¶ 1, 5.) Plaintiff was responsible for "answering phones, taking messages, prescription requests, checking in patients, and making sure patients had their paperwork filled out." (*Id.* ¶ 7.) Throughout his term of employment, Plaintiff reported directly to Zdenka Peros, a Practice Manager at the medical center.[6] (*Id.* ¶ 8.) During Plaintiff's employment, Karen Bethell served as the HR Business Partner at the medical center. (*Id.* ¶ 36.) Plaintiff was "never disciplined or written up" and "never received a negative performance evaluation" by Peros, or any other Medical Group employee, during his term of employment. (*Id.* ¶¶ 12—13.)

In June 2019, approximately three years into his employment at the medical center, Plaintiff was "diagnosed with bipolar disorder and major depressive disorder with psychotic features." (*Id.* ¶¶ 45-46.) As a result of his diagnosed conditions, Plaintiff suffered from manic episodes. (*Id.* ¶ 47.) During such episodes, "certain aspects of Plaintiff's ability to think are at a diminished capacity," and "[m]anic episodes also affect Plaintiff's ability to understand what others are saying to him." (*Id.* ¶¶ 49, 51.) Yet, "[e]ven when Plaintiff is in the

---

[6] Zdenka Peros was referred to as Zdenka Hackett during Plaintiff's employment. (ECF No. 34, ("Def.'s 56.1 Statement"), at 2 n.2.) For the sake of clarity, she will be referred to as "Peros" in this Memorandum and Order.

3

midst of a manic episode due to this bipolar disorder, he is sometimes able to act normally and present normally," to such a degree that "an individual speaking to him wouldn't necessarily know he is manic."[7]  (*Id*. ¶ 54.)

### A. Plaintiff's June to November 2019 Leave of Absence (2019 Manic Episode)

On June 26, 2019, as a result of a manic episode, Plaintiff was admitted to a hospital for "psychosis with paranoid ideations, religious preoccupations and reports of auditory hallucinations." (*Id*. ¶¶ 68, 70.)  Plaintiff then went on a leave of absence until November 3, 2019.  (*Id*. ¶ 73.)  While out on leave, Plaintiff's colleagues grew concerned about Plaintiff's conduct.  "Plaintiff texted and called several of his colleagues at all hours of the day and night." (*Id*. ¶ 74.)  He "[told] his co-worker Venisha Bryan [] that he didn't like specific employees." (*Id*. ¶ 75.)  "Plaintiff also told Bryan that when he returned to work ... he was 'going to put [Peros] in her place.'" (*Id*. ¶ 77.) "Eventually, Bryan asked Plaintiff to stop texting and harassing her and reported his behavior to Peros and HR." (*Id*. ¶ 78.)  His messages were concerning to a staff member in human resources who contacted another staff member overseeing workplace safety to communicate "that she was concerned about the safety of Plaintiff

---

[7] Plaintiff never told Peros verbatim that he had bipolar disorder, and Peros "never had any conversation with Plaintiff's colleagues about Plaintiff's bipolar disorder in 2019." (*Id*. ¶¶ 59-60.)

and his colleagues." (*Id.* ¶ 81.)

On October 30, 2019, Plaintiff's attending psychiatrist wrote a letter "stat[ing] that Plaintiff was 'psychiatrically stable to return to work at a part time capacity, 4 hours a day for two weeks beginning Nov. 4, 2019,' and that he could 'resume full time duty as tolerated on Nov. 18, 2019.'" (*Id.* ¶¶ 89–91.)

**B.    Plaintiff's Return to Work in November 2019**

"Plaintiff returned to work from his leave of absence on November 4, 2019," "spoke with Peros," and "asked about a change in his schedule after two weeks of part-time duty." (*Id.* ¶¶ 91–93.)  "In the morning of November 15, 2019, Peros spoke with Plaintiff about his work schedule moving forward." (*Id.* ¶ 95.) Plaintiff claims that, "on November 15, 2021, Plaintiff then asked Peros if he could extend his part-time schedule and Peros said no." (*Id.*)  Later in the morning on November 15, 2019, Peros sent Plaintiff an email stating as follows:

Hi Jonathan,[8]

As per our conversation this morning regarding your schedule, I want to confirm that you will be working full time (7.25) hours per day beginning 11/18/19.

We had 2 conversations regarding changes that you were considering to your weekly schedule. I had asked you for written proposals and let you know that any reasonable change would be considered. You declined both times and said you did not want to change anything.

Beginning Monday 11/18/19 your schedule will continue as

---

[8] Plaintiff also goes by the name "Jonathan."

it was prior to your leave.

(Pl.'s 56.1 Counterstatement ¶ 96.)  Although Plaintiff disputes the content of the referenced oral conversations between Plaintiff and Peros on November 15, 2019, (*id.*), Plaintiff "acknowledges that the subject e-mail 'could have' gone to his inbox."  (*Id.* ¶ 97.)  Further, it is undisputed that "Plaintiff believes he 'may have opened' the email that Peros sent to him on November 15, 2019, but that he did not read the full context and did not respond to this email."  (*Id.* ¶ 98.)

It appears that the next year and a half of Plaintiff's employment proceeded smoothly.  For example, Plaintiff "worked quite well with Epic," "a new electronic records system" the medical center began using.  (*Id.* ¶¶ 99-100.)  "Peros was grateful for Plaintiff's hard work, and praised him in a meeting by saying Plaintiff was 'doing a great job.'"  (*Id.* ¶ 100.)  Plaintiff's mental health disorders were not, at least in any noticeable way, affecting his work performance.  Still, at various times in April and May 2021, Plaintiff told others that he was considering leaving his job.  (*Id.* ¶¶ 112-119.)

### C.  Plaintiff's June to July 2021 Leave and Resigation (2021 Manic Episode)

Plaintiff began having issues at work again in June 2021.  On June 17, 2021, Plaintiff texted a colleague, Yamila Pichardo, that his workday was "crazy," that he was "so stressed," and that

he "got so mad at [Peros]." (*Id.* ¶¶ 120-21.) Plaintiff told Pichardo that he "was going to quit." (*Id.* ¶ 121.)

On June 23, 2021, Plaintiff had an unscheduled appointment with Tamar Green, a Licensed Clinical Social Worker, because "he got very stressed out at work [on June 22, 2021] and wanted to process his thoughts and feelings." (*Id.* ¶ 123.) During this session, Plaintiff mentioned that he and Peros had "a slight verbal altercation because Plaintiff was so stressed." (*Id.* ¶ 124.)

The next day, on June 24, 2021, Plaintiff again called Green for another unscheduled session and informed her about "family drama" he was experiencing including that "his younger sister told him that she wanted nothing to do with him ever again." (*Id.* ¶¶ 125-26.) Plaintiff admits that "[his] family drama with his sister affected his mental state and was a contributing factor to causing a manic episode" at that time, and it was clear to Green that Plaintiff "was acting erratically." (*Id.* ¶¶ 127-28.)

The following day, "June 25, 2021, was the last day that Plaintiff appeared for work." (*Id.* ¶ 130.) "Peros noted that Plaintiff was acting erratically in the workplace" in a manner Peros had not previously seen. (ECF No. 43, ("Def.'s 56.1 Reply Statement"), ¶¶ 380-81.) "On this day, Plaintiff told Pichardo that he 'got into it with [Peros]' because she told him that he was 'not answering the phones,' and that Peros is 'a jerk.'"

(Pl.'s 56.1 Counterstatement ¶ 132.)  Plaintiff texted a manager on June 29, 2021 to inform them that "he would be out the rest of this week" because "he was not feeling well." (*Id.* ¶ 133.)

On July 5, 2021, Plaintiff was admitted to a hospital due to "paranoid ideations." (*Id.* ¶ 135.)  On the next day, "July 6, 2021, Plaintiff texted Peros, stating he would not be coming in tomorrow due to a 'private matter.'" (Def.'s 56.1 Reply Statement ¶ 399.)

On July 7, 2021, while on leave and medicated due to his ongoing episode, Plaintiff called Peros – though he does not remember parts of the conversation. (Pl.'s 56.1 Counterstatement ¶¶ 143-44, 147.)  Plaintiff admits that, "[a]lthough he was experiencing hypomania, he was very calm during this phone call and seemed like his normal self." (*Id.* ¶ 145.)  Defendant claims that "Peros did not know that Plaintiff was ill in any way when they spoke on July 7, 2021." (*Id.* ¶ 148.)  Much of the contents of the conversation between Peros and Plaintiff are in dispute, but it is undisputed that "Peros told Plaintiff that she was sorry he wasn't feeling well and she wished him a speedy recovery." (Def.'s 56.1 Reply Statement ¶ 413.)  Peros memorialized the conversation by taking notes. (*Id.* ¶ 414.)  Plaintiff told Peros "that he felt that it was time for him to move on and spread his wings," and she was supportive. (*Id.* ¶¶ 415-16.)  The parties dispute whether Peros told Plaintiff that he should quit his job.

8

Plaintiff claims Peros told him he should quit; Defendant claims that Peros did not, on this call or ever, tell Plaintiff to quit. (Pl.'s 56.1 Counterstatement ¶ 150.)  "After speaking with Peros," Plaintiff texted at least five people that he had quit his job. (*Id.* ¶¶ 154-177.)

## LEGAL STANDARD

Below, the Court identifies the legal standards for summary judgment and supplemental jurisdiction (Part I); disability discrimination claims (Part II); and retaliation claims (Part III).

## I.    Motion for Summary Judgment

"Summary judgment is appropriate only if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Linton v. Zorn*, 135 F.4th 19, 30 (2d Cir. 2025) (internal quotations omitted).  "In determining whether there is a genuine dispute as to a material fact, we must resolve all ambiguities and draw all inferences against the moving party." *Qorrolli v. Metro. Dental Assocs.*, 124 F.4th 115, 122 (2d Cir. 2024) (internal quotations omitted).  "[S]ummary judgment is [] inappropriate, 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Linton*, 135 F.4th at 30 (quoting *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248 (1986)).

"Although the decision whether to decline to exercise

supplemental jurisdiction is purely discretionary ... [the Second Circuit] ha[s] repeatedly said that if a plaintiff's federal claims are dismissed before trial, the state law claims should be dismissed as well." *Oneida Indian Nation of New York v. Madison Cnty.*, 665 F.3d 408, 437 (2d Cir. 2011) (citation modified).

## II. Disability Discrimination Claims (Claims One, Three, and Five)

The Court now identifies the legal standards for disability discrimination claims under federal, state, and city law. In Part II.A, the Court discusses the legal standards for federal disability discrimination claims under the ADA. In Part II.B, the Court discusses the legal standards for state and city disability discrimination claims under the NSHRL and NYCHRL.

### A.   Federal Disability Discrimination (Claim One)

"Claims alleging disability discrimination in violation of the ADA are subject to the burden-shifting analysis originally established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013) (internal quotations omitted).  "A plaintiff must first establish a *prima facie* case of discrimination under the ADA, after which the burden of proof shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employer's conduct." *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 71 (2d Cir. 2019) (internal quotations omitted).  "If the

employer successfully meets its burden, the plaintiff must then demonstrate that the employer's assigned reason was a pretext or discriminatory in its application." *Id.* (citation modified).

As explained below, liability for disability discrimination under the ADA may be established through any one of the following theories of liability: (1) failure to accommodate, (2) hostile work environment, or (3) adverse employment action. Each theory of liability is discussed in turn.

### 1.    Failure to Accommodate Theory (Claim One)

Plaintiff's first theory of liability is failure to provide a reasonable accommodation.  In order to establish a *prima facie* case of disability discrimination under the ADA arising from a failure to provide reasonable accommodation, a plaintiff must demonstrate that: "(1) he is disabled within the meaning of the ADA; (2) his employer is a covered entity; (3) he could perform the essential functions of his job with an accommodation; and (4) the [employers] refused to provide such an accommodation despite being on notice." *Fox*, 918 F.3d at 73 (citation omitted).  "The ADA . . . require[s] an employer to afford reasonable accommodation of an employee's known disability unless the accommodation would impose an undue hardship on the employer." *Noll v. IBM Corp.*, 787 F.3d 89, 94 (2d Cir. 2015) (citation omitted).

"In the context of the ADA, reasonable accommodation may include, *inter alia*, modification of job duties and schedules,

11

alteration of the facilities in which a job is performed, acquisition of devices to assist the performance of job duties, and, under certain circumstances, reassignment to a vacant position." *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 97 (2d Cir. 2009) (internal quotations omitted). "The plaintiff bears the burdens of both production and persuasion as to the existence of some accommodation that would allow [him] to perform the essential functions of [his] employment." *Id.* (citation omitted).

### 2.    Hostile Work Environment Theory (Claim One)

Plaintiff's second theory of liability is hostile work environment. "[H]ostile work environment claims are cognizable under the ADA." *Fox*, 918 F.3d at 69. "To prevail on a hostile work environment claim, [Plaintiff] must show (1) that the harassment was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment, and (2) that a specific basis exists for imputing the objectionable conduct to the employer." *Id.* at 74. (citation modified). "Although the victim must subjectively perceive the conduct as abusive, the misconduct shown also must be severe or pervasive enough to create an objectively hostile or abusive work environment." *Id.* (internal quotations omitted). "Courts look to the totality of the circumstances to determine whether a plaintiff has met this burden, including proof of the frequency of the

discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with the plaintiff's work performance." *Id.* (citation modified).

### 3.  Adverse Employment Action Theory (Claim One)

Plaintiff's third theory of liability is adverse employment action.  In order to establish a *prima facie* case of disability discrimination under the ADA based on an adverse employment action, a plaintiff must show "by a preponderance of the evidence that: (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability." *Woolf v. Strada*, 949 F.3d 89, 93 (2d Cir. 2020).

"An adverse employment action must be more disruptive than a mere inconvenience or an alteration of job responsibilities and might be indicated by a termination of employment." *Fox*, 918 F.3d at 71 (internal quotations omitted).  "An adverse employment action may also take the form of a constructive discharge, which occurs 'when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation.'" *Caskey v. Cnty. of Ontario*, 560 F. App'x 57, 59 (2d Cir. 2014)

(summary order) (quoting *Morris v. Schroder Cap. Mgmt. Int'l*, 481 F.3d 86, 88 (2d Cir. 2007)). "Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir. 1996) (internal quotations omitted); *see also Finkelshteyn v. Staten Island Univ. Hosp.*, 687 F. Supp. 2d 66, 86 (E.D.N.Y. 2009) (citation omitted) (noting that the fact that Plaintiff "sought to return to work on a fulltime basis or . . . as a *per diem* employee" was enough to undercut "his contention that the hostile work environment was sufficient to compel his resignation.").

Given that "the ADA requires a but-for causation standard," Plaintiff must show the adverse action would not have occurred but for his employer's animus towards Plaintiff's disability. *Natofsky v. City of New York*, 921 F.3d 337, 349 (2d Cir. 2019).

## B.    State and City Claims for Disability Discrimination (Claims Three and Five)

Given the Second Circuit's guidance to avoid "unnecessarily delving into non-federal legal issues in the absence of any continuing basis for federal question jurisdiction," the Court will limit its discussion of the law governing state and local claims. *Norman v. NYU Langone Health Sys.*, No. 20-cv-3624, 2021 WL 5986999, at *6 (2d Cir. Dec. 17,

14

2021) (summary order) (citing *Giordano v. City of New York*, 274 F.3d 740, 754 (2d Cir. 2001)).

"Until recently, hostile work environment claims under the NYSHRL were governed by the same standard as federal law claims brought under Title VII." *Wheeler v. Praxair Surface Techs., Inc.*, 694 F. Supp. 3d 432, 451 (S.D.N.Y. 2023). But "October 11, 2019 . . . amendments to the NYSHRL broadened its reach . . . bring[ing] state law closer to the standard to establish a hostile work environment claim under [NYCHRL], under which a plaintiff need only show that he was treated less well than other employees because of their protected class." *Id.* (internal quotations omitted).

Disability discrimination claims under the NYCHRL "must be given an independent liberal construction, suggesting that its substantive protections may be broader than those provided by federal and state law." *Williams v. MTA Bus Co.*, 44 F.4th 115, 124 (2d Cir. 2022) (internal quotations omitted). "Federal civil rights statutes can serve only as a floor below which the NYCHRL cannot fall." *Brooklyn Ctr. for Indep. of the Disabled v. MTA*, 11 F.4th 55, 68 (2d Cir. 2021) (citation modified). "A plaintiff alleging a hostile work environment has a lower burden under city law than under its federal or state counterparts." *Williams v. NYCHA*, 61 F.4th 55, 69 (2d Cir. 2023). "For a NYCHRL claim to survive summary judgment, the plaintiff need only show that her

15

employer treated her less well than other employees, at least in part for a discriminatory reason." *Id*. (internal quotations omitted). Thus, "conduct that does not violate federal law may violate the NYCHRL." *Brooklyn Ctr. for Indep. of the Disabled*, 11 F.4th at 68 (citation omitted).

## III. Retaliation Claims (Claims Two, Four, and Six)

The Court now turns to the legal standards for Plaintiff's retaliation claims. In Part III.A, the Court discusses the legal standards for federal retaliation claims under the ADA. In Part III.B, the Court discusses the legal standards for state and city claims for retaliation under the NSHRL and NYCHRL.

### A.   Federal Claim for Retaliation (Claim Two)

"It is a violation of the ADA for an employer to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of any right granted or protected by this chapter." *Sharikov v. Philips Med. Sys. MR, Inc.*, 103 F.4th 159, 170 (2d Cir. 2024) (citation modified). "An employer may not take adverse action against an employee for engaging in protected activity." *Id*. (internal quotations omitted). "[Plaintiff] must show that he engaged in a protected activity, that he suffered an adverse employment action, and that a causal connection exists between that protected activity and the adverse employment action." *Fox*, 918 F.3d at 72–73 (citation omitted).

"The burden-shifting framework under *McDonnell Douglas*

also applies to retaliation claims under both the ADA and the NYSHRL." *Tafolla v. Heilig*, 80 F.4th 111, 125 (2d Cir. 2023) (citation omitted). The elements of a *prima facie* case of retaliation under the ADA are: "(i) a plaintiff was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action." *Id*. (internal quotations omitted).

"Protected activity is action taken to protest or oppose statutorily prohibited discrimination." *Natofsky v. City of New York*, 921 F.3d 337, 354 (2d Cir. 2019) (internal quotations omitted). "Activities protected by the ADA include complaints of ADA discrimination, including complaints on a good faith belief that the employer's actions violated the ADA, and requests for reasonable accommodations." *Flieger v. E. Suffolk BOCES*, 693 F. App'x 14, 18 (2d Cir. 2017) (summary order) (citing *Weixel v. Bd. of Educ. of City of N.Y.*, 287 F.3d 138, 149 (2d Cir. 2002)).

"With respect to causation, a plaintiff must prove that 'but for' the disability, the adverse action would not have been taken." *Tafolla*, 80 F.4th at 125 (internal quotations omitted). "Proof of causation can be established either (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence

or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Id.* (citation modified).

**B.   State and City Claims for Retaliation (Claims Four and Six)**

As explained earlier in Part II.B, the Court will limit its discussion of the law governing state and local claims in accordance with the Second Circuit's guidance.

District courts in this Circuit have noted that "[i]n 2019, the NYSHRL was amended so that the standard for NYSHRL retaliation claims aligns with the NYCHRL standard for retaliation claims, not the Title VII standard [or ADA standard]." *McDaniel v. Scotch & Soda Retail, LLC*, No. 23-cv-7859 (DLC)(RFT), 2024 WL 5456912, at *6 (S.D.N.Y. Nov. 22, 2024), *report and recommendation adopted*, No. 23-cv-7859 (DLC), 2025 WL 401108 (S.D.N.Y. Feb. 4, 2025) (citation omitted). "To show causation under the NYSHRL and NYCHRL, a plaintiff need only show that retaliatory animus was a motivating factor, that is, that it played *any* role at all in the challenged conduct." *Edelman v. NYU Langone Health Sys.*, 141 F.4th 28, 49 (2d Cir. 2025) (emphasis added).

"[T]he retaliation inquiry under the [NY]CHRL is broader than its federal counterpart" in at least two ways. *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 723 (2d Cir. 2010) (internal quotations omitted). *First*, instead of requiring but-for causation, "retaliation in any manner is prohibited" under the

18

NYCHRL.  *Id*. (internal quotations omitted).  *Second*, "the retaliation need not result in an ultimate action with respect to employment or in a materially adverse change in the terms and conditions of employment." *Id*. (citation modified).  In order to prevail on a retaliation claim under the NYCHRL, a "plaintiff must show that [he] took an action opposing [his] employer's discrimination . . . and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 112 (2d Cir. 2013) (citation omitted).

## DISCUSSION

Plaintiff asserts the following six claims:

- **Claim One:**   Disability discrimination under the ADA
- **Claim Two:**   Retaliation under the ADA
- **Claim Three:** Disability discrimination under the NYSHRL
- **Claim Four:**  Retaliation under the NYSHRL
- **Claim Five:**  Disability discrimination under the NYCHRL
- **Claim Six:**   Retaliation under the NYCHRL

(ECF No. 1.)  These six claims fall into two categories: (i) disability discrimination claims (Claims One, Three, and Five), and (ii) retaliation claims (Claims Two, Four, and Six).  (*Id.*) Defendant moves for summary judgment on all claims.  (ECF No. 48.)

Below, the Court analyzes each of the two sets of claims in turn.  In doing so, the Court is mindful of the Second Circuit's guidance to avoid "unnecessarily delving into non-federal legal issues in the absence of any continuing basis for federal question

jurisdiction." *Norman*, 2021 WL 5986999, at *6 (citing *Giordano*, 274 F.3d at 754).

## I.   Disability Discrimination Claims (Claims One, Three, and Five)

For each of his disability discrimination claims, Plaintiff alleges three theories of liability: (i) failure to accommodate, (ii) hostile work environment, and (iii) adverse employment action. As explained below, none of Plaintiff's theories of liability for disability discrimination under the ADA (Claim One) are viable. Accordingly, the Court grants Defendant's motion for summary judgment as to Plaintiff's federal disability discrimination claim (Claim One).

The Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state and city claims (Claims Three and Five) for disability discrimination under the NYSHRL and NYCHRL.

### A.   Federal Disability Discrimination (Claim One)

For Claim One, Plaintiff alleges that Defendant "engaged in unlawful employment practices in violation of the Americans with Disability Act by refusing to accommodate Plaintiff, treating Plaintiff with hostility, and terminating him because of his disability." (ECF No. 1 ¶ 131.) Claim One fails because Plaintiff cannot establish a *prima facie* case of discrimination under any of the three proposed theories of liability. The Court will address each proposed theory of liability, in turn, below.

### 1. Failure to Accommodate Theory of Liability (Claim One)

"The ADA envisions an 'interactive process' by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated." *Jackan v. New York State Dep't of Labor*, 205 F.3d 562, 566 (2d Cir. 2000). "Liability for failure to provide a reasonable accommodation ensues only when the employer is responsible for a breakdown in that interactive process." *Graham v. Macy's, Inc.*, No. 14-cv-3192 (PAE), 2016 WL 354897, at *6 (S.D.N.Y. Jan. 28, 2016) (internal brackets omitted) (internal quotations omitted), *aff'd*, 675 F. App'x 81 (2d Cir. 2017) (summary order). "An employer impedes the process when: the employer knows of the employee's disability; the employee requests accommodations or assistance; the employer does not in good faith assist the employee in seeking accommodations; and the employee could have been reasonably accommodated but for the employer's lack of good faith." *Graham*, 2016 WL 354897, at *6 (internal quotations omitted), *aff'd*, 675 F. App'x 81 (2d Cir. 2017) (summary order).

Plaintiff alleges that Defendant failed to accommodate Plaintiff's disability twice – first, after his 2019 manic episode, and second, during his 2021 manic episode. (ECF No. 49 at 24-28.) For the reasons explained below, Defendant did not violate the ADA by failing to reasonably accommodate Plaintiff's disability.

### a. First Alleged Failure to Accommodate (2019 Manic Episode)

Plaintiff's first alleged instance of Defendant's failure to accommodate is Defendant's 2019 refusal to extend Plaintiff's part-time schedule beyond the two-week period specified by his psychiatrist. On October 30, 2019, Plaintiff's attending psychiatrist sent a letter "stat[ing] that Plaintiff was 'psychiatrically stable to return to work at a part time capacity, 4 hours a day for two weeks beginning Nov. 4, 2019,' and that he could 'resume full time duty as tolerated on Nov. 18, 2019.'" (Pl.'s 56.1 Counterstatement ¶ 90.) Defendant's accommodation for Plaintiff – two weeks of part-time work and then full-time work – was reasonable under the circumstances. After all, "under the ADA, an employee has no right to any particular accommodation, but merely to a reasonable accommodation." *Thompson v. City of New York*, No. 03-cv-4182 (JSR) (JCF), 2006 WL 2457694, at *5 (S.D.N.Y. Aug. 10, 2006) (internal quotations omitted), *report and recommendation adopted,* 2006 WL 6357978 (S.D.N.Y. Sept. 11, 2006), *aff'd sub nom. Thompson v. New York City Dep't of Prob.*, 348 F. App'x 643 (2d Cir. 2009) (summary order). Plaintiff seizes onto the "as tolerated" language in his psychiatrist's letter regarding full-time work beyond the two-week part-time period, (ECF No. 49 at 26), but he offers no evidence that he could not "tolerate[]"

full-time work starting November 18, 2019.[9]  Moreover, Plaintiff does not dispute that Peros sent him an email on November 15, 2019, which he may have opened but did not read in full or respond to, in which Peros noted (i) that Plaintiff and Peros had two conversations about his work schedule, (ii) that Peros asked Plaintiff for "written proposals" and told him "that any reasonable change would be considered," and (iii) that Plaintiff "declined both times and said [he] did not want to change anything." (Pl.'s 56.1 Counterstatement ¶ 96.)  Plaintiff appears to have performed well and had a smooth work experience for approximately a year and a half following his return to full-time work in November 2019. (Pl.'s 56.1 Counterstatement ¶ 100.)  Viewing the facts in the light most favorable to Plaintiff, there is no evidence that Defendant failed to reasonably accommodate Plaintiff's disability in November 2019.

### b.   Second Alleged Failure to Accommodate (2021 Manic Episode)

Plaintiff's second alleged instance of Defendant's failure to accommodate is that Peros failed, during her July 7, 2021 phone call with Plaintiff, to (i) proactively recognize

---

[9] Moreover, Peros's November 15, 2019 email to Plaintiff confirmed, *inter alia*, that Plaintiff declined to provide any written proposals for further accommodations and that "any reasonable change would be considered." (Pl.'s 56.1 Counterstatement ¶ 96.)  Regardless of whether Plaintiff opened the email from Peros, Plaintiff cannot establish that his "employer is responsible for a breakdown in th[e] interactive process" because it was Plaintiff who failed to read and contest this email. *Graham*, 2016 WL 354897, at *6 (S.D.N.Y. Jan. 28, 2016) (internal brackets omitted) (internal quotations omitted), *aff'd*, 675 F. App'x 81 (2d Cir. 2017) (summary order).

Plaintiff's need for an accommodation and (ii) provide an accommodation without Plaintiff asking for it. (ECF No. 49 at 26-27.) Specifically, Plaintiff argues that Peros should have accommodated Plaintiff's disability during that call by "at a minimum, ... forestall[ing] or reject[ing] any talk about his separation from employment." (ECF No. 49 at 24 n.6.)

Plaintiff relies on a Second Circuit case, *Brady v. Wal-Mart*, for the proposition that "an employer has a duty reasonably to accommodate an employee's disability if the disability is obvious — which is to say, if the employer knew or reasonably should have known that the employee was disabled." 531 F.3d 127, 135 (2d Cir. 2008). A closer look at *Brady* however reveals a very different set of facts than those in this case.

*First*, *Brady* acknowledges that "generally, it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed." *Id.* (citation modified). This is the general rule that applies to the overwhelming majority of situations requiring disability accommodations.

*Second*, the plaintiff in *Brady* had an obvious and permanently debilitating physical disability that triggered a narrow exception to the general rule requiring the disabled person to seek accommodations. Specifically, the plaintiff, Mr. Brady, was "a nineteen-year-old man with cerebral palsy." *Id.* at 130.

24

"[Mr. Brady's] disability manifested itself in noticeably slower walking, walking with a shuffle and limp, recognizably slower and quieter speech, not looking directly at people when talking to them, weaker vision, and a poor sense of direction." *Id.* Unlike Mr. Brady, Plaintiff in the instant case has a disability that causes only intermittent, episodic impairments at work. By Plaintiff's own admission, his disability is sometimes invisible and undetectable to others such that Plaintiff may "act normally and present normally," and "an individual speaking to him wouldn't necessarily know he is manic." (Pl.'s 56.1 Counterstatement ¶ 54.) Plaintiff's employer could not be reasonably expected to detect on any given day whether Plaintiff is impaired and, if so, to what degree.[10]

Given the undisputed facts in this case, Plaintiff's disability in the instant case was not "obvious" like that of Mr. Brady,[11] and therefore the general rule applies: "[I]t is the

---

[10] Plaintiff's contention that Peros should have divined that he was in the midst of a bipolar episode in July 2021 is belied by the undisputed fact that Plaintiff never told Peros verbatim that he had bipolar disorder. (Pl.'s 56.1 Counterstatement ¶ 59.) Plaintiff suggests that, during the July 7, 2021 phone call, Peros should have essentially diagnosed Plaintiff's bipolar disorder, recognized that he was so impaired by a manic episode that he could not rationally make decisions, and proactively accommodated him by refusing to allow him to resign. (ECF No. 49 at 26.) Plaintiff cites to no authority suggesting the ADA imposes such a heavy burden on a supervisor not trained or experienced in diagnosing mental health conditions.

[11] To be clear, the Court does *not* hold that a mental health disorder can *never* be "obvious" under *Brady* and trigger an employer's affirmative duty to accommodate a disability. Rather, the Court finds that the facts of this case – specifically Plaintiff's admission that his impairment may sometimes be undetectable to others – fails to satisfy the "obvious[ness]" requirement under *Brady*.

responsibility of the individual with a disability to inform the employer that an accommodation is needed." *Brady*, 531 F.3d at 135. Defendant did not fail to accommodate Plaintiff in July 2021 because, rather than seek an accommodation, Plaintiff resigned his position. Contrary to Plaintiff's contention, his employer had no duty to proactively accommodate him by refusing to allow him to resign. In sum, Plaintiff cannot establish a failure to accommodate theory of liability for Count One.

### 2. Hostile Work Environment Theory of Liability (Claim One)

"To establish a hostile work environment ... a plaintiff must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Littlejohn v. City of New York*, 795 F.3d 297, 320-21 (2d Cir. 2015) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)). "This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Littlejohn*, at 321 (internal quotations omitted). "The incidents complained of must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Id.* (internal

quotations omitted).

Plaintiff's claim of hostile work environment appears to rely on: (i) believing he was "required" to work overtime on the weekend between May 1, 2021 and July 7, 2021; (ii) using the employer's new electronic records system; (iii) Peros "accus[ing] Plaintiff of not answering the telephone" on June 17, 2021; and (iv) Peros berating or "accus[ing] Plaintiff of not answering the telephone" on June 25, 2021 "in a very boisterous manner." (ECF No. 49 at 20-21.) Even assuming Plaintiff's characterizations of his interactions with Peros are wholly true (and disregarding countervailing evidence of Peros being supportive of Plaintiff), the Court finds, under the "totality of the circumstances," that Plaintiff has not remotely met his burden of alleging a *prima facie* claim of a hostile work environment.[12] *Fox*, 918 F.3d at 74. These four interactions, even construed in the light most favorable to Plaintiff, are not frequent, severe, physically threatening, humiliating, or offensive to a degree that would violate federal law. *See, e.g.*, *Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 119 (2d Cir. 2010) (summary order) (holding that defendants "excessively criticiz[ing] [the plaintiff's] work, refus[ing] to answer work-related questions, arbitrarily impos[ing] duties outside of her responsibilities, thr[owing] books, and sen[ding]

---

[12] Although Defendant elected not to file a motion to dismiss for failure to state a claim, Plaintiff has not plausibly alleged a hostile work environment under the ADA.

rude emails to her" are not incidents that "support a finding of a hostile work environment that is pervasive or severe").

Critically, Plaintiff also does not provide any evidence of discriminatory animus. The allegedly discriminatory interactions (i.e. being asked to work overtime, using a new records system, and being accused of not answering the phone) did not arise from discriminatory animus regarding Plaintiff's mental health disability. Given that "the ADA requires a but-for causation standard," Plaintiff must present, at minimum, *some* evidence that the alleged mistreatment he suffered would not have occurred but for his employer's animus towards Plaintiff's disability. *Natofsky*, 921 F.3d at 349. Plaintiff has not done so here.

In sum, the hostile work environment theory for Count One fails because Plaintiff cannot establish both (i) that his workplace conditions were a hostile work environment under the ADA, and (ii) that Plaintiff's unpleasant interactions with his supervisor were borne out of discriminatory animus.

### 3. Adverse Employment Action Theory of Liability (Claim One)

Plaintiff's federal claim for disability discrimination under a theory of adverse employment action fails because Plaintiff cannot show that "he suffered adverse employment action because of his disability" – or, in fact, that he suffered any adverse

employment action at all. *Woolf*, 949 F.3d at 93. Plaintiff's adverse employment action theory of liability for disability discrimination rests on a faulty premise – that "[Plaintiff] was constructively discharged" during his July 7, 2021 phone call with Peros. (ECF No. 49 at 23.)

"The constructive-discharge doctrine contemplates a situation in which an employer discriminates against an employee to the point such that his working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Green v. Brennan*, 578 U.S. 547, 555 (2016) (internal quotations omitted). Critically, "[c]reation of a hostile work environment is <u>a necessary predicate</u> to a hostile-environment constructive discharge case." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 149 (2004) (emphasis added). In fact, the Supreme Court in *Suders* held that existence of a hostile work environment (the second proposed theory of liability discussed in the preceding section) is a "lesser included component" of a claim asserting constructive discharge based on a hostile work environment. *Id*. Because Plaintiff cannot establish the necessary predicate of a hostile work environment, he could not have suffered a hostile-environment constructive discharge. Plaintiff's decision to resign employment does not constitute an adverse employment action, defeating this theory of liability for Count One and warranting summary judgment in Defendant's favor.

**4.    Defendant is Entitled to Summary Judgment on Claim One**

Having reviewed and analyzed the parties' arguments on each of the three proposed theories of liability for Claim One, the Court finds Defendant is entitled to summary judgment on Claim One.

**B.    State and City Claims for Disability Discrimination (Claims Three and Five)**

In accordance with the Second Circuit's guidance, the Court declines supplemental jurisdiction over Plaintiff's state and city law claims for disability discrimination brought under the NYSHRL and NYCHRL.  "Although the decision whether to decline to exercise supplemental jurisdiction is purely discretionary ... [the Second Circuit] ha[s] repeatedly said that if a plaintiff's federal claims are dismissed before trial, the state law claims should be dismissed as well."  *Oneida Indian Nation of New York*, 665 F.3d at 437 (citation modified).

**II.  Retaliation Claims (Claims Two, Four, and Six)**

Plaintiff alleges retaliation claims under the ADA, NYSHRL, and NYCHRL.  For the following reasons, the Court grants Defendant's motion for summary judgment as to Plaintiff's federal claim for retaliation under the ADA and declines to exercise supplemental jurisdiction over Plaintiff's remaining state and city claims for retaliation under the NYSHRL and NYCHRL.

**A.    Federal Claim for Retaliation (Claim Two)**

Plaintiff's federal claim of retaliation under the ADA rests on a theory of constructive discharge – that Defendant constructively discharged Plaintiff as retaliation for Plaintiff going on leave in July 2021.  (ECF No. 49 at 28-30.)  Under the ADA, "[Plaintiff] must show [1] that he engaged in a protected activity, [2] that he suffered an adverse employment action, and [3] that a causal connection exists between that protected activity and the adverse employment action."  *Fox*, 918 F.3d at 72-73.

As to the first element, it is debatable whether Plaintiff's July 2021 leave request under the Family and Medical Leave Act (FMLA) was a protected activity.[13]  But Plaintiff's federal retaliation claim unequivocally fails on the second element because he did <u>not</u> suffer the adverse employment action he believes he suffered – namely, constructive discharge by Peros during their July 7, 2021 phone call.  As discussed earlier, *see supra*, "[t]he constructive-discharge doctrine contemplates a situation in which an employer discriminates against an employee to the point such that his working conditions become so intolerable that a reasonable person in the employee's position would have

---

[13] Courts within the Second Circuit are divided on the question of whether a request for FMLA leave is enough to qualify as a protected activity.  *See Simon v. New York City Dep't of Educ.*, No. 23-CV-7796 (EK)(LKE), 2025 WL 2256593, at *8 n.16 (E.D.N.Y. Aug. 7, 2025) ("In the absence of a [Second] [C]ircuit ruling as to whether medical leave constitutes a reasonable accommodation as a matter of law, district courts have split on the question of whether FMLA requests are protected activities.")

felt compelled to resign." *Green*, 578 U.S. at 555 (internal quotations omitted). "Creation of a hostile work environment is a necessary predicate to a hostile-environment constructive discharge case." *Suders*, 542 U.S. at 149. For the reasons the Court has already discussed in Parts I.A.2 and I.A.3 of this section, Plaintiff was not subjected to workplace conditions that qualify as a hostile work environment under federal law. Plaintiff's resignation was therefore not a hostile-environment constructive discharge. The absence of a constructive discharge defeats Plaintiff's argument that he was constructively discharged in retaliation for requesting FMLA leave.

**B.   State and City Claims for Retaliation (Claims Four and Six)**

In accordance with the Second Circuit's guidance, the Court again declines supplemental jurisdiction over Plaintiff's state and city law claims for retaliation brought under the NYSHRL and NYCHRL. "Although the decision whether to decline to exercise supplemental jurisdiction is purely discretionary ... [the Second Circuit] ha[s] repeatedly said that if a plaintiff's federal claims are dismissed before trial, the state law claims should be dismissed as well." *Oneida Indian Nation of New York*, 665 F.3d at 437 (citation modified).

<u>**CONCLUSION**</u>

For the reasons discussed above, the Court finds there

is no genuine issue of material fact with respect to Claims One and Two (Plaintiff's federal claims for disability discrimination and retaliation under the ADA), and the Court GRANTS summary judgment to Defendant on Claims One and Two.  The Court DECLINES supplemental jurisdiction on Plaintiff's remaining state and city claims, and therefore Claims Three, Four, Five, and Six are DISMISSED WITHOUT PREJUDICE.  The motion for a charging lien filed by Plaintiff's former attorneys, (ECF No. 53), is DENIED AS MOOT.

The Clerk of Court is respectfully directed to (i) enter judgment in favor of Defendant on Claims One and Two and (ii) close this case.  Defendant is respectfully directed to serve on Plaintiff, now *pro se*, a copy of both this Memorandum and Order and the Clerk's Judgment and to note service on the docket by November 14, 2025.

**So ordered.**

Dated:    November 12, 2025
          Brooklyn, New York

_____
**Kiyo A. Matsumoto**
United States District Judge
Eastern District of New York